**RENISHAW PLC, Plaintiff–Appellant,**

v.

**MARPOSS SOCIETA' PER AZIONI and Marposs Corporation, Defendants–Appellees.**

No. 98–1007.

United States Court of Appeals,
Federal Circuit.

Sept. 16, 1998.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Nov. 18, 1998.

Edward P. Walker, Oliff & Berridge, PLC, of Alexandria, Virginia, argued for plaintiff-appellant. With him on the brief was James A. Oliff. Of counsel on the brief were James A. Samborn and Mark K. Riashi, Dickinson, Wright, Moon, Van Dusen & Freeman, of Detroit, Michigan.

Jeffrey M. Johnson, Dickstein, Shapiro, Morin & Oshinsky LLP, of Washington, DC, argued for defendants–appellees. With him on the brief were Charles W. Saber, James W. Brady, Jr., and Laurence E. Fisher. Of counsel was Eric Oliver.

Before PLAGER, CLEVENGER, and GAJARSA, Circuit Judges.

CLEVENGER, Circuit Judge.

This appeal requires us to determine whether the district court made errors of claim construction that resulted in an erroneous finding of noninfringement at the close of a bench trial. *See Renishaw PLC v. Marposs Societa' Per Azioni,* 974 F.Supp. 1056 (E.D.Mich.1997). At trial, Renishaw plc (Renishaw) asserted that four claims from three patents were infringed by the Mida product line of touch probes produced by Marposs Societa' per Azioni and Marposs Corporation (collectively Marposs). Renishaw appeals only the finding of noninfringement of claim 2 of its U.S. Patent No. 5,491,-904 (the '904 patent). Because we conclude that the district court properly found one limitation of the claim not satisfied, we affirm.

I

The '904 patent, listing David McMurtry as its inventor, describes and claims an improved touch probe. Touch probes are used in the automated manufacturing and measurement field to check with extreme precision the dimensions of machined parts. A touch probe consists of a long, thin stylus that extends out from a housing and that can deflect in all directions. The probe, which is mounted on a movable arm of a machine, produces an electrical "trigger" signal when the stylus contacts a workpiece to be measured. A computer that controls the movement of the arm uses the trigger signal to calculate the dimensions or location of the workpiece. Although the stylus can be several inches long, a touch probe often exhibits accuracy on the order of one micron (one millionth of a meter) or less. This relatively small dimension must be kept in mind when discussing the attributes of touch probes. Figures 1 and 2 of the '904 patent show one embodiment of the patented touch probe in vertical and horizontal cross-section, respectively:

Fig. 1.

Fig. 2.

In these figures, an inverted cup, or stylus holder 12, carries a stylus 14 with a sensing tip 15 at its distal end. The stylus holder is located inside a housing 10 and has an annular skirt 18 that rests against a flat interior surface 20 of the housing. The annular skirt is pushed into tight contact with the housing by a biasing spring 24. When the sensing tip hits an object, the stylus deflects and the stylus holder tilts inside the housing, rotating about a point on the annular skirt where the skirt contacts the housing. A light emitting diode 42 normally shines through an aperture 44 in the stylus to a pair of light detectors 46. However, when the stylus deflects because of contact with an object, the aperture moves and the light beam is deflected. The light detectors sense the change and then send a signal to the computer that runs the machine. When the stylus moves back away from the object, the biasing spring pushes the stylus holder back down into full contact with the housing, and the light beam returns to the undeflected state.

With only the structure described above, the stylus holder is likely to slide around some in the housing so that the probe cannot deliver consistent performance. As a solution to this problem, the figures show the stylus poking through, and connected to, a planar spring 30 which is simply a sheet of flexible material and which is attached at its outer edge to a ring 32. The ring serves as the connecting base for three cylinders 34 which in turn are seated between pairs of balls 36 fixed to the housing. This planar spring assembly, also known as a kinematic mount, can be analogized to a flag pole (*i.e.*, the stylus) stuck through a hole in the surface of a three-legged trampoline. The planar spring prevents the stylus holder from rotating (*i.e.*, about the Z axis) and keeps it from sliding back and forth inside the housing (*i.e.*, in the X and Y axes). When the stylus begins to deflect, the planar spring flexes slightly so that the kinematic mount can remain tightly engaged. With greater deflection, the cylinder on the side opposite the deflection eventually lifts out of its seat, much like a leg on the analogous trampoline would lift off the ground if the flag pole sticking through the flexible surface of the trampoline leaned over too far.

The embodiment just described purportedly solves two problems in the prior art: lobing and hysteresis. Lobing occurs when, because of the way the stylus holder is mounted in the housing, a greater amount of stylus deflection is required to trigger the probe in some directions than in others. The pictured embodiment reduces lobing because the annular skirt results in equal deflection in every direction. Because the probe triggers upon relatively equal deflection in any direction, it can achieve micron-level accuracy by signaling soon after the stylus contacts a workpiece.

Hysteresis occurs when the stylus returns to a different position after each deflection (*i.e.*, the stylus does not center fully); it is caused primarily by friction between the probe components. The pictured embodiment reduces hysteresis because the biasing spring pushes the cylinders tightly into their seats between the balls, returning the stylus to the same rest position each time. The key

issue on appeal is whether the *claimed* touch probe solves both these problems. Claim 2 recites (emphasis added):

2. A touch probe, for use on a movable arm of a position determining apparatus, the probe having a housing with an axis and a stylus holder located within the housing, the stylus holder carrying an elongate stylus which projects through an aperture in the housing, and which has a sensing tip at a free end thereof, *the probe generating a trigger signal when said sensing tip contacts an object and said stylus holder is thereby deflected relative to said housing*, the trigger signal being used by the position determining apparatus to take a reading of an instantaneous position of the movable arm, the touch probe comprising:

biasing means for applying an axial biasing force to said stylus holder;

a device acting between said stylus holder and said housing for constraining said stylus holder relative to the housing, the device including a seating and at least one constraining spring distinct from the biasing means, said seating including at least one pair of mutually engageable elements, each mutually engageable element having a surface inclined relative to the axis of the housing and providing lateral constraint from axial biasing;

an annular member retained in a predetermined relationship with the stylus holder and having an annular surface facing in a direction of said aperture, said annular member being tiltable relative to the housing, and said stylus holder being tiltable with said annular member relative to said housing about a point on said annular surface; and

a transducer for generating said trigger signal, said transducer being actuable by tilting of said stylus holder with said annular member about said point on said annular surface, wherein said tilting of said stylus holder relative to the housing is accommodated by flexing of said at least one constraining spring and said mutually engageable elements coming out of contact with each other.

Renishaw asserts infringement of claim 2 by Versions 4 and 5 from Marposs's Mida line of touch probes. The Version 5 probe is illustrated in vertical and oblique cross-section in plaintiff's exhibits below:

In the Mida probes, the stylus holder ("armset" in the diagram) has a spherical surface that rests in a conical seat in the housing and a central extension that rises toward a microswitch. The stylus holder also has an annular member ("disk" in the diagram), but unlike the annular skirt in the preferred embodiment of the '904 patent, it does not normally rest flat against the housing. Rather, it rests above a shelf built into the side of the housing and is separated from the shelf by a small gap. Thus, when the stylus contacts an object, the stylus holder does not immediately move upward toward the microswitch. Instead, it first rotates inside the conical seat (like a ball-and-socket joint). Once the annular disk hits the shelf, the stylus holder tips upward and its central extension hits the microswitch.[1]

The annular ring cannot rest in flat contact with the shelf, and therefore, the spring can only force the stylus to return to a "neutral zone" rather than to a single precise rest position. As a result, the Mida probes are not designed to signal as soon as the stylus begins to move. Instead, they do not signal until the probe reaches the edge of the neu-tral zone. Because the size of the neutral zone is known, the location of the object being measured can be calculated. Thus, although the Mida probes do not eliminate hysteresis, they nonetheless provide precise readings.

Renishaw sued Marposs in July 1994, and a bench trial on infringement was held in March 1997. During the trial, Marposs presented no evidence regarding invalidity. At the close of the evidence, the district court took the case under advisement and requested proposed findings and post-trial briefs from both sides. In August 1997, the court found that none of Marposs's accused touch trigger probes infringed any of the asserted patent claims. Renishaw appeals the finding of noninfringement only with respect to claim 2 of the '904 patent. We have jurisdiction under 28 U.S.C. § 1295(a)(1) (1994).

## II

An infringement analysis is a two-step process in which we first determine the correct claim scope, and then compare the properly construed claim to the accused device to determine whether all of the claim

---

**1.** The Version 4 probes and the Version 5 probes differ only in the location of the biasing spring. On the Version 5 probes (pictured), the spring runs from the edge of the microswitch to the central extension of the stylus holder. On the Version 4 probes (not pictured), the spring's diameter is larger and the spring runs from the probe housing to the top of the annular ring.

limitations are present either literally or by a substantial equivalent. *See General Mills, Inc. v. Hunt–Wesson, Inc.*, 103 F.3d 978, 981, 41 USPQ2d 1440, 1442 (Fed.Cir.1997). We review the first step without deference to the trial court, *see Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455, 46 USPQ2d 1169, 1173 (Fed.Cir.1998) (in banc), and the second step for clear error when infringement is tried to the bench, *see Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141, 42 USPQ2d 1589, 1592 (Fed.Cir.1997).

On appeal, Renishaw asserts that the district court erred in construing three separate limitations in claim 2 and that those errors resulted in the court's erroneous finding of noninfringement. We address the claim requirement that the "probe generat[e] a trigger signal when said sensing tip contacts an object." Renishaw contends that the district court improperly read a limitation into this claim limitation from the '904 patent's written description.

Renishaw, of course, alludes to a familiar pair of claim construction canons: (a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation, for a claim must be read in view of the specification of which it is a part. These two rules lay out the general relationship between the claims and the written description. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–80, 34 USPQ2d 1321, 1329–30 (Fed. Cir.1995) (in banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). As rules at the core of claim construction methodology, they provide guideposts for a spectrum of claim construction problems.

Although no canon of construction is absolute in its application,[2] these two rules share two underlying propositions. First, it is manifest that a claim must explicitly recite a term in need of definition before a definition may enter the claim from the written description. This is so because the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim, *see Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023, 43 USPQ2d 1545, 1548 (Fed.Cir.1997) ("[T]he language of the claim frames and ultimately resolves all issues of claim interpretation."); *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619–20, 34 USPQ2d 1816, 1819 (Fed.Cir.1995). The intrinsic evidence, and, in some cases, the extrinsic evidence, can shed light on the meaning of the terms recited in a claim, either by confirming the ordinary meaning of the claim terms or by providing special meaning for claim terms. *See Vitronics*, 90 F.3d at 1583, 39 USPQ2d at 1577. However, the resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property. *See Thermalloy, Inc. v. Aavid Eng'g, Inc.*, 121 F.3d 691, 693, 43 USPQ2d 1846, 1848 (Fed.Cir.1997) ("[T]hroughout the interpretation process, the focus remains on the meaning of claim language.").

Thus, a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements. Without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right. The Supreme Court has clearly stated the rationale for this requirement:

**2.** *See Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551, 37 USPQ2d 1609, 1612 (Fed.Cir.1996) ("All rules of construction must be understood in terms of the factual situations that produced them, and applied in fidelity to their origins."); *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 397, 155 USPQ 697, 702 (Ct.Cl.1967) ("In utilizing all the patent documents, one should not sacrifice the value of these references by the unimaginative adherence to well-worn professional phrases." (internal quotation marks omitted)); *cf.* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed*, 3 Vand.L.Rev. 395, 401–06 (1950) (listing thrusts and parries of canons of construction of statutory provisions to illustrate their tractability).

[W]e know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim . . ., we should never know where to stop.

*McCarty v. Lehigh Val R.R.,* 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895). If we need not rely on a limitation to interpret what the patentee meant by a particular term or phrase in a claim, that limitation is "extraneous" and cannot constrain the claim. *See Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 950, 28 USPQ2d 1936, 1938 (Fed. Cir.1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.") (quoting *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir.1988)); *see also Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987, 6 USPQ2d 1601, 1605 (Fed. Cir.1988) ("Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims.") (citing *Lemelson v. United States,* 752 F.2d 1538, 1551–52, 224 USPQ 526, 534 (Fed.Cir.1985)); *cf. Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571, 7 USPQ2d 1057, 1065 (Fed.Cir.1988) (holding that the written description provided "no evidence to indicate that [ ] limitations must be imported into the claims to give meaning to disputed terms").

 The other clear point provided by these two canons covers the situation in which a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term. In such a case, the definition selected by the patent applicant controls. The patentee's

lexicography must, of course, appear "with reasonable clarity, deliberateness, and precision" before it can affect the claim. *In re Paulsen,* 30 F.3d 1475, 1480, 31 USPQ2d 1671, 1674 (Fed.Cir.1994); *see Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388, 21 USPQ2d 1383, 1386 (Fed.Cir.1992). If the patentee provides such a clear definition, the two canons require reference to the written description, because only there is the claim term defined as it is used by the patentee.[3] The law provides a patentee with this opportunity because the public may not be schooled in the terminology of the technical art or there may not be an extant term of singular meaning for the structure or concept that is being claimed. *See Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 889, 221 USPQ 1025, 1031 (Fed.Cir.1984).

 Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning. *See York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning."); *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1577, 27 USPQ2d 1836, 1840 (Fed.Cir. 1993). Thus, when a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims. *See Modine Mfg.,* 75 F.3d at 1551, 37 USPQ2d at 1612. Nor may we, in the broader situation, add a narrowing modifier before an otherwise general term that stands unmodified in a claim. *See, e.g., Bell Communications,* 55 F.3d at 621–22, 34 USPQ2d at 1821 (faulting the district court for interpreting claim term "associating" to cover only explicit, and not implicit, association); *Specialty Composites,* 845

---

3. Likewise, any interpretation that is provided or disavowed in the prosecution history also shapes the claim scope. *See Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 867, 228 USPQ 90, 93–94 (Fed.Cir.1985) (holding that although term was not limited by the specification, it was "expressly defined" in a narrow manner in the prosecution history); *see also CVI/Beta Ventures, Inc. v. Tura*

*LP,* 112 F.3d 1146, 1158–59, 42 USPQ2d 1577, 1585–86 (Fed.Cir.1997) (reviewing statements in the prosecution history in determining that claim term "elasticity" required total, not just partial, recovery from deformation); *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452, 227 USPQ 293, 296 (Fed.Cir.1985).

F.2d at 986–87, 6 USPQ2d at 1604 (refusing to limit the recited claim term "plasticizer" to external plasticizers where skilled artisans used the term broadly). For example, if an apparatus claim recites a general structure (*e.g.*, a noun) without limiting that structure to a specific subset of structures (*e.g.*, with an adjective), we will generally construe the claim to cover all known types of that structure that are supported by the patent disclosure. *See, e.g., Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 865–66, 45 USPQ2d 1225, 1229 (Fed.Cir.1997) (claim term "reciprocating" is given its ordinary meaning and not limited to mere linear reciprocation); *Sjolund v. Musland*, 847 F.2d 1573, 1581–82, 6 USPQ2d 2020, 2027 (Fed.Cir.1988) (refusing to limit claim term "baffle" to only rigid baffles and term "panel" to only panels of lattice construction).

■ However, a common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty. As one of our predecessor courts stated in *Liebscher v. Boothroyd*, 46 C.C.P.A. 701, 258 F.2d 948 (CCPA 1958):

> Indiscriminate reliance on definitions found in dictionaries can often produce absurd results.... One need not arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim. The subject matter, the context, etc., will more often than not lead to the correct conclusion.

*Id.* at 951; *see Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1346–47, 47 USPQ2d 1418, 1426 (Fed.Cir.1998); *see also Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 836, 20 USPQ2d 1161, 1174 (Fed.Cir.1991) (affirming construction of "permanent" as a relative term in light of the patent disclosure); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 298, 227 USPQ 657, 668 (Fed.Cir.1985) (claim limitation requiring that a process be carried out "under substantially anhydrous conditions with the removal of water above 100°C" covered only *continuous* removal of water, because the written description stated that failure to remove water continuously would

adversely affect the process). Thus, where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning.

Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461, 1470 (1996). The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. *See Young Dental*, 112 F.3d at 1142, 42 USPQ2d at 1593 (affirming the district court's claim construction as "a more natural reading of the claim language" than the appellant's construction); *cf.* Llewellyn, *supra* note 2, at 401 ("Plainly, to make any canon take hold in a particular instance, the construction contended for must be sold, essentially, by means other than the use of the canon: The good sense of the situation and a *simple* construction of the available language to achieve that sense, *by tenable means, out of the statutory language.*"). A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent.

Following these principles, we turn to the parties' arguments.

### III

■ The main dispute concerns the requirement that "the probe generat[e] a trigger signal when said sensing tip contacts an object and said stylus holder is thereby deflected relative to said housing." The district court determined that "when" is defined by reference to this entire claim limitation, such that "when" means as soon as contact is made and deflection occurs. *See Renishaw*, 974 F.Supp. at 1089. On appeal, Renishaw argues that "when" should receive one of its broader dictionary definitions: "at or after the time that," "in the event that," or "on condition that," so that the claim would read on a device that does not generate a trigger

signal until an appreciable amount of time after contact is made and deflection begins. Because infringement of this limitation depends on the meaning of the word "when," we refer to it in the remainder of the opinion as the "when" limitation. We agree with the district court's construction of this claim limitation and, because all limitations must be met for there to be infringement, we need consider only this limitation.

The ultimate issue is the manner in which "when" defines the timing of probe triggering vis-à-vis contact of a stylus with a workpiece. The issue brings into sharp focus the convergence of the two canons of claim construction discussed above. According to Renishaw, the accused probes escape infringement only if a narrowing limitation is read into "when" from the written description. Marposs counters with an argument that the claim is properly construed to require a finding of noninfringement because the correct meaning of the claim term "when" is embedded throughout the specification.

Neither party forwards a technical meaning for "when" in the applicable industry. However, there are several closely-related, but distinct, common meanings for "when," most cited by Renishaw on appeal. These include: at or during the time that; just at the moment that; at any or every time that; at, during, or after the time that.[4] Renishaw asserts that nothing in claim 2 places an outer endpoint on the time at which a trigger signal must be generated, other than that the device be capable of generating some trigger signal. Therefore, contends Renishaw, the trial court's definition of the term was overly narrow, and the claim is properly defined simply as "at or after the time that." For its part, Marposs argues that the '904 patent's written description exhibits a clear intent to provide triggering as soon as possible after contact with a workpiece, not at appreciable times after contact. Marposs argues that in claim 2 the use of "when" provides an entry point into the claim for that intent.

The explicit language of claim 2 is our starting point. There, the claim states that a signal is generated "when" there is contact with a workpiece "and said stylus holder is thereby deflected." The claim ties the signal to contact and deflection, thus showing that the trigger signal cannot occur until the probe has contacted the workpiece *and* the stylus has deflected some amount. In other words, contact and deflection are a condition precedent to signaling. Thus, the claim itself precludes us from viewing "when" as requiring signaling at the precise moment of contact, for some deflection must occur before signaling. The district court also recognized this. *See Renishaw*, 974 F.Supp. at 1071; *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373–74 (Fed.Cir.1998) (looking to other terms in a claim to construe a limitation in dispute); *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465, 45 USPQ2d 1421, 1426 (Fed.Cir.1998) (same).

Mere recognition that "when" is not limited to the precise moment of contact, however, does not make the term clear, or mandate a meaning of "when" to include any time after contact as long as a measurement is derived from stylus contact. That is because "when" is not a broad and general term when standing in isolation. Instead, it has several meanings, each of which may prevail based on the context. Here, we have bounteous context. Claim 2 does not exist in rarefied air, but rather is surrounded by a patent disclosure of singular purpose. As evidenced by the several common meanings of "when," the term is imprecise as used in the '904 patent. The term is not ambiguous, however, because the written description provides overwhelming evidence to guide a proper interpretation of the term. *See Vitronics*, 90 F.3d at 1583, 39 USPQ2d at 1577. Replete with references that indicate that the patentee was preeminently concerned with generating a trigger signal as soon as possible after contact, the written description lends precision to the term "when." The written description shows that the patentee's invention is directed at a machine that produces

---

4. These definitions are taken from *Webster's Ninth New Collegiate Dictionary* 1342 (1985); *Webster's Third New International Dictionary* 2602 (1993); and the *Chambers Concise Dictionary* 1223 (1992).

very accurate, very precise probe readings by maintaining tight control over the position of the stylus. In the context of the invention, such readings can only be obtained if the probe triggers very, very soon after contact.

For example, in describing the invention's place within the prior art, the '904 patent notes: "When the stylus contacts a workpiece surface, a trigger signal is generated by the probe, which is used to trigger the taking of a reading of the instantaneous position of the movable spindle, quill or arm." Col. 1, ll. 36–42. Likewise, the Summary of the Invention states that the preferred embodiment of the probe "includes means for providing a signal when said stylus contacts a workpiece," col. 3, ll. 28–29, and that the movable elements are displaced "out of said rest position when said stylus contacts a workpiece," col. 3, ll. 21–22.

Statements in the "Description of Preferred Embodiments" also use the term "when" to describe a time very close to the precise instant that the stylus contacts the object to be measured and not some appreciable time thereafter:

> When the stylus 14 contacts a workpiece, from any direction, the stylus is deflected. For example, if the contact is in a horizontal direction, the stylus 14 tilts, about a point of contact between the surfaces 20 and 22. At this time, the cylinders 34 and balls 36 remain engaged with each other, and the tilting is accommodated by flexing of the planar spring 30. . . .
>
> . . . .
>
> When the deflecting force on the stylus 14 ceases (i.e. when the probe is moved so that the stylus 14 no longer contacts the workpiece) the stylus member 12 is returned to its axial and lateral rest position by the action of the spring 24.

Col. 4, l. 52 to col. 5, l. 7. This passage refers to "when" as "at this time," *i.e.,* when the planar spring is flexing and the cylinders, or analogously, the legs of the trampoline, have not yet lifted out of their moorings. In other passages, the written description states: "The *instant at which* the stylus tip 15 *first contacts* a workpiece can be detected in various possible ways," col. 6, ll. 10–11, that the photoelectric sensor is responsive to motion caused "when the stylus 14 *begins* to deflect upon contact with a workpiece," col. 6, ll. 33–34, "when the stylus 14 is deflected by contact with a workpiece, the cage 86 *initially* remains stationary in its kinematic rest position," col. 8, ll. 60–63, "[a]ll of the embodiments of FIGS. 4–10 may have any of the arrangements for detecting the *instant of contact* between the stylus tip and a workpiece," col. 9, ll. 16–20, and:

> In operation, when the stylus 14 is deflected by contact with a workpiece, *at first* the skirt 72 and cage 64 lift or tilt bodily from the surfaces 74. . . . Also for the same reason, when eventually the stylus returns to its rest position, there is little or no hysteresis in its rest position.
>
> However, the above bodily lifting or tilting of the cage 64 *upon deflection* of the stylus *only lasts for a very small amount of stylus deflection.*

Col. 8, ll. 11–13 (emphasis added to all quotations). These passages make abundantly clear that "when" in the patent means at the time of, and not some appreciable time thereafter. *See Autogiro Co.,* 384 F.2d at 397, 155 USPQ at 702–03 ("[W]ords must be used in the same way in both the claims and the specification.").

To the extent that these passages refer to the preferred embodiment, they cannot be read into the claims without some hook. The claim term "when" is that hook. Each of the passages above show that the patentee wanted "when" to mean as soon as possible after contact. In contrast, Renishaw's preferred construction of "when," which would sweep in any time whatsoever after contact, is so broad that it would require us to ignore the abounding statements in the written description that point decidedly the other way.

Renishaw might have us save its claim by placing a functional limitation on the claim such that "when" would permit signaling at any time after contact but no longer than would permit accurate measurement of the workpiece. However, this limitation appears nowhere in the claims; rather, it comes from a concept of operability. To the extent Renishaw must refer to the written description, the patentee's extremely detailed account of

his invention in that written description shows that his aim was to generate a signal as soon as possible after contact, not to generate a signal at appreciable times after contact. Any delay in signaling with Renishaw's probes creates an unrecoverable error, because they must equate the position of the probe at the moment of signaling with the position of the workpiece. Therefore, delay in signaling while the probe continues to move creates an error. The patentee strove to eliminate this error, and the entire patent document exhibits his intent to make the delay between contact and signaling as small as possible.

Our construction of "when" matches that of the district court. Although the district court initially construed "when" to mean "at the time that," it recognized that its choice of words could be read out of context to require immediate signaling, a physical impossibility. The district court therefore clarified its construction as follows:

> While it is of course true that the laws of nature dictate that no detection device can be "absolutely instantaneous," the claims, specifications, figures, and Mr. McMurtry's testimony confirm that the patented probes signal as soon as possible when the stylus tip contacts the workpiece. The quicker the Renishaw probes trigger, the better their performance. In short, the patents teach the quickest signaling possible, and there is no suggestion otherwise. In fact, Mr. McMurtry stated that he taught good probes with quick signals, "wouldn't do anything but that, but to teach the best."

*Renishaw*, 974 F.Supp. at 1071. Consistent with this understanding and with the understanding that the claimed probes operate at a micron-level scale, we hold that claim 2 covers probes which signal within a nonappreciable period of time after contact such that the delay in signaling is insignificant when compared to the sensitivity and accuracy of the probe.

### IV

The operation of the Marposs Mida probes is not disputed. They signal after an appreciable amount of movement of the sty-

lus which is well after the contact with the workpiece and initial deflection. In fact, this appreciable delay is part of the design of the Mida probes and ensures that they can operate properly without centering fully. The same delay that creates unrecoverable error in the probes disclosed in the '904 patent is necessary to provide accuracy in the Mida probes. The Mida probes can still measure precisely, but they do so by taking advantage of designed-in delay. There is thus no clear error in the court's finding that the Mida probes do not literally infringe the "when" limitation.

Renishaw hints in its submissions on appeal that Marposs's probes at least infringe by equivalents. However, Renishaw's citations to the record indicate only that the issue of *literal* infringement was raised at trial. Thus, there is no need to remand to the district court. We therefore affirm.

*AFFIRMED.*